In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-2013

TRADE FINANCE PARTNERS, LLC,

*Plaintiff-Appellant,*

*v.*

AAR CORPORATION, d/b/a AAR AIRCRAFT
COMPONENT SERVICES, and AAR ALLEN SERVICES, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 3466—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED JANUARY 6, 2009—DECIDED JULY 16, 2009

Before KANNE, WOOD, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* This is a case involving a complex business arrangement and technical terminology, but it presents a remarkably simple question: did the plaintiff company secure a contract on behalf of its client, the defendant company? If so, the plaintiff gets paid; if not, it has earned nothing.

On June 29, 2005, Northwest Airlines awarded a contract to the defendant in this case, AAR Allen Services, Inc., for maintenance, repair, and overhaul services on its aircrafts' avionic, hydraulic, and pneumatic components. The plaintiff, Trade Finance Partners, LLC, claims that its efforts led Northwest to award that contract to AAR Allen, a Trade Finance client. Trade Finance sought payment from AAR Allen for securing Northwest's business, as purportedly provided by the parties' agreement. AAR Allen refused, and Trade Finance sued for breach of contract and fraud. The district court granted summary judgment against Trade Finance on all counts. We agree that summary judgment was appropriate.

## I. BACKGROUND

Trade Finance Partners, LLC, is comprised of a single "member," Callen Cooper, and it describes itself as a "trade finance firm" that provides asset recovery programs for its clients. Trade Finance's business model is somewhat complex, but it essentially acts as a broker between its client, a product or service supplier, and companies with whom the client desires to do business. Trade Finance offers the target company a unique financing arrangement, the details of which are not pertinent to this case. Trade Finance benefits by earning a percentage of the business it secures for its clients. One of Trade Finance's clients was defendant AAR Allen, a subsidiary of defendant AAR Corp., which is a leading aviation support company that provides a broad

range of products and services to the aviation industry.[1]

### A. The Trade Finance-AAR Allen Business Relationship

Trade Finance approached AAR Allen in the fall of 2004 seeking to establish a business relationship. After preliminary discussions, Trade Finance proposed a draft agreement on September 2, but the two parties began working together without a finalized contract "on the assumption" that a final agreement would be forthcoming. During this time, Trade Finance claims that AAR Allen orally identified Northwest Airlines, among others, as a desired business account.

Trade Finance and AAR Allen did not reach a finalized contract until mid-January 2005, when they executed the Strategic Trade Agreement ("Agreement").[2] Consistent with Trade Finance's business model, the parties agreed that Trade Finance would solicit business on AAR Allen's behalf from companies identified as "Target Accounts."

---

[1] The parties disputed whether AAR Corp., which was not a party to the agreement at issue, was a proper defendant. The district court did not address this dispute because it determined that Trade Finance's claims failed on the merits. We reach the same conclusion and therefore refer solely to AAR Allen for the remainder of the discussion, except when referring to AAR Corp. specifically.

[2] Robert Bruinsma, then a vice president and general manager at AAR Allen, signed the Agreement on January 10, 2005; Trade Finance's Callen Cooper signed on February 1.

Upon securing such business, AAR Allen would pay Trade Finance a previously agreed-upon percentage of the earnings, an amount the Agreement dubbed the "Business Development Fund." Because Trade Finance bases its claims on an alleged breach of the Agreement, we examine its provisions in more detail.

According to section 1 of the Agreement, AAR Allen retained Trade Finance to "secure" business from Target Accounts that AAR Allen specifically identified in a Request for Information ("RFI"). The Agreement stipulated that "no companies shall be deemed a Target Account until it has been agreed as such by both Client and Trade Finance in a written Target Account RFI."[3] A completed RFI must specifically detail the material terms of Trade Finance's authority to negotiate on AAR Allen's behalf, including the volume of business, the "Option Period,"[4] and the amount Trade Finance would earn from the transaction. The RFI must be in writing and "in substantially the form and substance as attached" to the

---

[3] Furthermore, the provisions defining the Business Development Fund (section 2.1) and the Option Period (section 2.2) both stated that those terms "shall be set forth in the Target Account RFI (or a supplement thereto) and shall be agreed upon prior to Trade Finance's discussions with Target Account regarding securing a contract with the Target Account on behalf of the Client."

[4] Section 2.2 of the Agreement defines the "Option Period" as the agreed-upon period of time during which Trade Finance has the exclusive right to secure a contract with the Target Account on AAR Allen's behalf.

Agreement.[5] The parties also agreed, however, that AAR Allen may identify a Target Account through other oral or written communications, "subject to further confirmation in a written Target Account RFI."

Once a Target Account had been identified, Trade Finance's right to payment arose after it "secured" the business specified in the RFI. In addition to a percentage of the new business, Trade Finance received the first $25,000 of a $60,000 retainer fee within ten days of executing the Agreement and would obtain the remaining $35,000 within thirty days after Trade Finance secured the first supply contract with a Target Account.

### B. The AAR Allen-Northwest Contract

In 2004, Northwest Airlines sought bids for maintenance, repair, and overhaul services on avionic, hydraulic, and pneumatic aircraft components. As part of the bid process, Northwest issued to AAR Allen a Request for Proposal.[6] AAR Allen responded by submitting to Northwest an initial bid around October 2004, approximately

---

[5] The parties dispute whether the sample RFI was appended to the final, executed version of the Agreement. The district court did not address this issue because it found that Trade Finance did not secure the contract in question, eliminating the need to consider whether the parties properly designated Northwest as a Target Account in an RFI.

[6] The record is unclear whether Northwest sent Requests for Proposal to other companies, and, if so, to whom, their content, and when Northwest sent them.

three months before it signed the Agreement with Trade Finance in January 2005. As the district court noted, the record is remarkably undetailed regarding the development of AAR Allen's relationship with Northwest from October 2004 onward. As of January 2005, Northwest's Request for Proposal was its only outstanding request to AAR Allen related to avionic, hydraulic, and pneumatic services.

According to Trade Finance, AAR Allen indicated as early as the fall of 2004 that it was interested in business with Northwest. In December 2004, AAR Allen's general manager, Robert Bruinsma, allegedly informed Trade Finance's Callen Cooper that AAR Allen had been unsuccessful in obtaining long-term business from Northwest in the past and that Trade Finance should treat Northwest as a Target Account under the Agreement. Bruinsma suggested that Trade Finance contact AAR Allen's vice president for sales and marketing, Frank Boni, to obtain a copy of the bid that AAR Allen submitted in October 2004. According to Cooper, Boni told Trade Finance that the October 2004 proposal was currently outstanding and that AAR Allen would like to procure that business. Despite the absence of an executed agreement or a completed RFI, Trade Finance began to reach out to Northwest.

By January 2005, Trade Finance had established contact with Timothy Johnson, Northwest's director of technical commodity management. Johnson was involved in selecting the winning bid for Northwest's pending maintenance, repair, and overhaul contract, and

he was also a decision-maker regarding whether Northwest would agree to Trade Finance's proposed business model in any future dealings.

The precise subject of Trade Finance's early communications with Northwest is unclear. In January 2005, Trade Finance outlined, in general terms and without reference to AAR Allen, its business model and the alleged benefits it could offer. Northwest responded by seeking specific examples of the possible savings Trade Finance could provide and the companies it represented. Trade Finance also met with Northwest representatives. After AAR Allen signed the Agreement on January 10, Trade Finance divulged its new client to Northwest. It also appears that Trade Finance proposed that Northwest award AAR Allen a landing gear contract. On January 13, as a result of these initial communications, Northwest's Johnson sent Trade Finance's Cooper the following e-mail:

> The landing gear contracts have been signed and no further sourcing is required.
>
> I don't agree that AAR's pricing is competitive. We have not been able to reach agreement with AAR on a [sic] several projects for a number of reasons. Due to confidentially [sic] reasons, I cannot divulge the specific causes.
>
> Any other companies and/or services you'd like to discuss.
>
> Tim

Trade Finance claims that it relayed Northwest's response to Boni, Bruinsma, and other AAR Allen personnel, who encouraged Trade Finance to continue its

efforts. AAR Allen purportedly indicated that it would complete a Target Account RFI after it received an updated Request for Proposal from Northwest. It also allegedly encouraged Cooper to convince Northwest representatives to visit AAR Allen's New York facility.

Spurred by this encouragement, Cooper claims to have called Craig Reidlinger, Northwest's mechanical commodity manager, on February 9. Reidlinger was Johnson's subordinate and had no formal decision-making authority regarding service contracts. According to Cooper, Reidlinger explained some reasons for Northwest's reluctance to award business to AAR Allen. Trade Finance asserts that the comments by Johnson and Reidlinger revealed that a "secret barrier" prohibited business between Northwest and AAR Allen.

Cooper supposedly responded to Reidlinger that AAR Allen remained interested and would "do whatever it takes" to be Northwest's long-term partner, to which Reidlinger responded that "AAR is not out of the game" and that he expected to speak with Frank Boni to arrange a visit to AAR Allen's New York facility. Cooper relayed this conversation in an e-mail to Boni, but approximately one hour before Cooper sent this e-mail, Reidlinger had already contacted Boni.

Around this time, in February 2005, Northwest updated its 2004 Request for Proposal by issuing to AAR Allen a "Phase 2" Request for Proposal for avionic, hydraulic, and pneumatic services. The record does not indicate what precipitated this second Request or to which companies Northwest sent it. According to Trade Finance, AAR Allen

did not divulge the Phase 2 Request, nor did it divulge its direct communications with Northwest. Unbeknownst to Trade Finance, AAR Allen responded to the Phase 2 Request by submitting a new proposal updating its October 2004 bid.

From this point forward, Trade Finance claims that AAR Allen refused to cooperate in pursuing Northwest's business. Trade Finance purportedly presented a draft RFI formally designating Northwest as a Target Account, which AAR Allen ignored. On April 22, 2005, Trade Finance proposed a joint letter encouraging Northwest to award the contract to AAR Allen, but AAR Allen refused to sign it. Boni indicated at that time that he did not believe Northwest would shift business to AAR Allen based on Trade Finance's business model and that AAR Allen would have a better chance to win the contract by simply reducing its prices. After April 22, Trade Finance claims that AAR Allen gave it the "silent treatment."

Northwest ultimately selected AAR Allen's revised proposal, and on June 29, 2005, the two parties executed a contract for services on Northwest's avionic, hydraulic, and pneumatic components (the "Northwest Contract"). The terms of the Northwest Contract reflected AAR Allen's discounted prices and other incentives, not terms similar to Trade Finance's business model. Trade Finance did not learn of AAR Allen's successful bid until after AAR Allen executed the Northwest Contract.

Northwest's Tim Johnson stated that he determined early on that Trade Finance's approach would not benefit Northwest, and he expressly declared that Trade

Finance's efforts had no effect on Northwest's final decision. Both Johnson and Reidlinger recalled that Trade Finance's initial communications related to landing gear services, not avionics, hydraulic, and pneumatic work, although Reidlinger acknowledged that it was possible that the parties discussed other subjects. Johnson testified that Northwest had conducted significant business with AAR Corp. in the past, including work at its New York facility; that airlines cannot help but use AAR Corp. because of its size and attractive prices; and that Northwest had no reason to categorically refuse bids from AAR Allen.

Based on this sequence of events, Trade Finance believes that its efforts caused Northwest to award the contract to AAR Allen, or, at a minimum, that Trade Finance was a catalyst for AAR Allen's successful bid. Trade Finance filed suit in the Northern District of Illinois, alleging breach of contract and fraud. On March 21, 2008, AAR Allen moved for summary judgment on all claims. The district court determined that no reasonable juror could conclude that Trade Finance secured the Northwest Contract. Without a triable issue regarding this crucial fact, the district court held that Trade Finance was not entitled to payment under the parties' Agreement or damages for the alleged fraud, and it granted summary judgment in AAR Allen's favor.

## II. ANALYSIS

On appeal, Trade Finance asserts that the district court improperly granted summary judgment against it. We

review *de novo* the grant of summary judgment and construe all facts in the light most favorable to Trade Finance, the nonmoving party. *See Jones v. City of Springfield, Ill.*, 554 F.3d 669, 671 (7th Cir. 2009). Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive summary judgment, "there must be evidence on which the jury could reasonably find for the [nonmoving party]," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and the nonmoving party must point to specific facts showing that there is a genuine issue for trial; inferences relying on mere speculation or conjecture will not suffice, *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008). Trade Finance raises a number of issues on appeal, but its success hinges on whether it presented sufficient evidence that its efforts secured the Northwest Contract for AAR Allen.

### A. Breach of Contract

The parties' Agreement stipulates that it is governed by New York law, which identifies four elements for a breach of contract claim: (1) existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting damages. *Nathel v. Siegal*, 592 F. Supp. 2d 452, 470-71 (S.D.N.Y. 2008). A contract certainly existed, but the parties dispute the remaining three elements. According to the Agreement, Trade Finance was entitled to compensation only if it secured business with a Target Account on AAR Allen's behalf.

Trade Finance's position is that prior to its efforts in early 2005, Northwest was unwilling to award new business to AAR Allen, including the services that later became the subject of the Northwest Contract. Trade Finance contends that as a direct result of its efforts, Northwest reconsidered this position, took a fresh look at AAR Allen's proposal, scheduled a site visit to AAR Allen's New York facility, and subsequently awarded it the Northwest Contract. Callen Cooper admitted, however, that he has no personal knowledge of Northwest's reasons for its decision. Instead, to demonstrate its role, Trade Finance relies heavily on statements made by Northwest's Tim Johnson and Craig Reidlinger, which Trade Finance claims reflect a "secret barrier" between AAR Allen and Northwest.

AAR Allen naturally takes a different position. First, it argues that the statements upon which Trade Finance relies are inadmissible hearsay. Second, even if admissible, it asserts that Trade Finance did not secure the Northwest Contract. According to AAR Allen, Trade Finance's initial communications with Northwest related primarily to landing gear services, and any subsequent discussions had no effect on Northwest's decision making. AAR Allen had already submitted a bid for the Northwest Contract when it engaged Trade Finance, and AAR Allen submitted a revised bid in 2005 without Trade Finance's assistance. AAR Allen realized that Trade Finance's business model did not make it competitive and chose instead to reduce its prices.

The communications from Northwest employees are at the heart of Trade Finance's theory, for they represent the

only evidence of why Northwest accepted AAR Allen's proposal. Trade Finance claims that two communications in particular suggest that it facilitated the Northwest Contract: (1) a January 13, 2005, e-mail from Johnson to Callen Cooper; and (2) statements that Reidlinger allegedly made to Cooper during a telephone conversation on February 9. The district court determined that Johnson's January 13 e-mail was admissible for purposes other than the truth of the matters asserted and that Cooper's February 9 e-mail recounting his alleged phone conversation with Reidlinger, as well as Reidlinger's e-mail to Boni on the same day, were inadmissible hearsay. We do not believe that the district court abused its discretion in making its evidentiary determinations, *see Griffin v. Foley*, 542 F.3d 209, 217-18 (7th Cir. 2008) (noting that a district court does not abuse its discretion unless no reasonable person would agree with its ruling), but we need not address them. Trade Finance cannot demonstrate a triable issue of whether it secured the Northwest Contract *even with* the disputed communications in evidence.

Trade Finance's theory that its efforts "secured" the Northwest Contract proceeds along a chain of logical links, each of which AAR Allen disputes. First, AAR Allen claims that Trade Finance's initial communications with Northwest were limited solely to a landing gear contract. Second, even if the communications were not so limited, there was no "secret barrier" preventing AAR Allen from obtaining long-term business with Northwest. Third, even if there was such a barrier, Trade Finance's efforts did not vault AAR Allen over it and cause North-

west to award it the contract. And finally, even if there was a secret barrier, there is nothing in the record to suggest that Trade Finance facilitated Northwest's visit to AAR Allen's New York facility or that this visit sealed the deal for AAR Allen. We address each link in this chain and ultimately find them all to be faulty.

*1. The parties' initial communications related to landing gear.*

First, Trade Finance suggests that it contacted Northwest to solicit business of many varieties, including the services that later became the Northwest Contract. We know that Trade Finance initially approached Northwest by generically outlining its business model without referring to AAR Allen. After Trade Finance divulged that it represented AAR Allen, the subject of the parties' communications became more muddled.

AAR Allen maintains that Trade Finance's initial overtures related solely to a landing gear contract. On January 13, Northwest's Johnson e-mailed Cooper, stating that "[t]he landing gear contracts have been signed and no further sourcing is required." The logical inference from this statement is that Northwest and Trade Finance had previously discussed a landing gear contract. Johnson confirmed this by testifying that he recalled that his initial discussions with Trade Finance related to landing gear services only,[7] and Reidlinger recalled the same.

---

[7] Trade Finance claims that the district court made an improper credibility determination by crediting Johnson's testimony

(continued...)

Cooper himself indicated that at least one focus of the initial communications related to a landing gear contract; responding to Johnson's January 13 e-mail, Cooper suggested that Trade Finance represented companies other than AAR Allen and asked what contracts were still "out for bid," specifically stating that it was "disappointing to know that we missed landing gear in the interim since our meeting."

The district court accepted as an undisputed fact that Northwest's initial meetings with Trade Finance—and therefore Johnson's January 13 e-mail—related to a landing gear proposal. We see no error in this determination. Local Rule 56.1(b) requires a party in the Northern District of Illinois to file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon."

---

[7] (...continued)
about the subject matter of the January 13 e-mail, which it claims contradicts the e-mail itself. But Trade Finance has not demonstrated any contradiction. The e-mail expressly begins by referring to a landing gear proposal, and nothing in the remainder of the e-mail suggests that Northwest disfavored AAR Allen for all services. Johnson explained that his reference to pricing and other undisclosed reasons for failing to reach an agreement with AAR Allen related to a landing gear contract and that most airlines cannot avoid using AAR Corp. or its subsidiaries for at least some repair services. Trade Finance has produced no evidence to the contrary, and the district court did not improperly credit Johnson's testimony.

Paragraph sixty-five of AAR Allen's Statement of Undisputed Material Facts asserted that Northwest understood Trade Finance's proposal to relate to AAR Allen's ability to service landing gear, citing as support the admissible testimony of Reidlinger and Johnson. In response, Trade Finance stated only that "Reidlinger and Johnson admitted incomplete recollection of their communications and meetings with Trade Finance." The district court did not abuse its discretion by determining that this was inadequate to dispute the subject matter of Trade Finance's proposal. *Cf. O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 987 (7th Cir. 2001) ("We review the district court's rulings on [Local Rule 56.1] statements for an abuse of discretion. And the district court has the discretion to enforce [Rule 56.1] strictly or somewhat leniently."[8] (citation and quotations omitted)).

If Johnson's January 13 e-mail related solely to a landing gear proposal, it is not probative of Trade Finance's role in securing the subsequent avionics, hydraulics, and pneumatics contract, and we find no error in the district court's determination to this effect.

2.   *No other evidence suggests that a "secret barrier" existed between Northwest and AAR Allen.*

Next, *even if* Trade Finance's early discussions and Johnson's January 13 e-mail included topics beyond the

---

[8] The Northern District of Illinois re-labeled its Local Rules 12(M) and 12(N) as Local Rules 56.1(a) and 56.1(b), respectively. *See O'Regan*, 246 F.3d at 987 nn. 5-6.

landing gear contract, a possibility the record does not foreclose entirely, the evidence does not create a triable issue of material fact. Trade Finance proffers Johnson's e-mail to show that a "secret barrier" prevented new business between Northwest and AAR Allen. But nothing in the e-mail refers to a broad reluctance to deal with AAR Allen, nor does it refer to the specific services that later became the Northwest Contract. Johnson and Reidlinger both testified that Northwest had previously awarded a significant amount of work to AAR Allen's New York facility (which would be performing the Northwest Contract services), and it had no reason to refuse to deal with AAR Allen now. Johnson explained that "most airlines cannot help but use AAR for repair services because of their breadth of capabilities and their attractive pricing in the marketplace." Although Trade Finance asserts that this prior work was only short-term, Johnson's e-mail does not reveal an insurmountable hurdle for AAR Allen, nor is the e-mail probative of Trade Finance's efforts to secure Northwest's business.

Similarly, Reidlinger's comments in his February 9 conversation with Cooper do not suggest that Northwest disfavored AAR Allen as a vendor, nor are they probative of Trade Finance's eventual role in securing the Northwest Contract. According to Cooper, Reidlinger stated that AAR Allen's pricing was not competitive and that Northwest had trouble with AAR Allen's legal counsel in the past, but that "AAR is not out of the game." Notwithstanding that Reidlinger's statements are clearly hearsay and that Reidlinger testified that these statements were strictly related to the landing gear contract, there is mention of neither the subject matter of the discus-

sion nor a categorical reluctance to work with AAR Allen. The unclear context of the discussion suggests, at most, that AAR Allen had not been a competitive bidder in the past.

Consequently, we find nothing in the record that creates a genuine issue of whether Northwest was predisposed to deny new long-term business to AAR Allen.

3.  *Trade Finance did not "secure" the Northwest Contract for AAR Allen.*

Third, *even if* we accept Trade Finance's argument that it proposed the relevant services *and* that AAR Allen faced a preexisting barrier to business with Northwest, Trade Finance cannot show that its efforts vaulted AAR Allen over that barrier. AAR Allen presented admissible evidence from a decision-maker at Northwest that Trade Finance played no role in the decision to award the contract to AAR Allen. After hearing Trade Finance's proposals, Northwest's Johnson determined that Trade Finance's "financing schemes" were undesirable and "would not bring value to Northwest Airlines in a reasonable manner." Thus, Northwest did not award AAR Allen the landing gear contract and subsequently rebuffed additional solicitations by Trade Finance. Regarding the decision to award the Northwest Contract to AAR Allen, Johnson stated: "Nothing that [Trade Finance] did influenced our decisions with AAR, or could influence our decisions with AAR." Furthermore, AAR Allen submitted its first bid for the Northwest Contract in October 2004, before Trade Finance's involvement,

and it submitted its revised bid in early 2005, without input from Trade Finance or financing terms similar to Trade Finance's model. In light of such evidence, Trade Finance must present specific evidence, not mere speculation, to properly dispute whether Trade Finance secured the Northwest Contract.

As noted above, the parties' initial communications lend no support to Trade Finance's cause. Trade Finance approached Northwest, engaged in a few dispersed discussions, and proposed a unique financing arrangement, which Northwest ultimately rejected.[9] After Johnson's e-mail on January 13, 2005, the record indicates that

---

[9] Although not the basis of our decision, we are unconvinced that AAR Allen and Trade Finance solidified Northwest as a "Target Account" pursuant to the Agreement. Nearly all of Trade Finance's obligations were predicated on a completed RFI detailing the terms of Trade Finance's negotiations on AAR Allen's behalf. Even if the parties orally agreed to establish Northwest as a Target Account, the contract required a written RFI confirming this, something the parties never completed. As far as we can tell, Trade Finance would have been justified in refusing to do *any* work on AAR Allen's behalf until an RFI was completed for the Northwest account. Although Trade Finance claims that AAR Allen wrongfully refused to complete such an RFI, at the very least, the lack of a formal document creates further ambiguity about (1) AAR Allen's interest in Trade Finance's business model; (2) AAR Allen's desire to use Trade Finance to propose the specific services that were the subject of the Northwest Contract; and, most importantly, (3) the subject matter and specificity of Trade Finance's communications with Northwest.

Trade Finance contacted Northwest sporadically for approximately three weeks. Nothing in the record suggests that Trade Finance's conversations with Northwest involved the subject-matter of the Northwest Contract, nor has Trade Finance presented any specific proposal that it offered to Northwest for *any* services, much less the Northwest Contract.

To the contrary, the record indicates that Northwest saw no benefit to Trade Finance's business arrangement, and it repeatedly rejected Trade Finance's overtures. Trade Finance claims that it persuaded Northwest to deal with AAR Allen, but the timing of events suggests otherwise. Trade Finance insists that its conversation with Reidlinger on February 9 helped warm Northwest to AAR Allen, but Northwest solicited an updated bid from AAR Allen over a week earlier, on February 1. This means that to support Trade Finance's claims, its efforts on AAR Allen's behalf must have had at least some effect before that date, something the record does not support. Trade Finance has not explained any actions it took that precipitated the updated Request for Proposal. In fact, AAR Allen never informed Trade Finance that it received the Phase 2 Request for Proposal, the details of that request, or the deadlines for submitting a proposal. Trade Finance did not learn until later that AAR Allen submitted an updated proposal on March 8. Without knowledge of the Phase 2 Request or AAR Allen's new proposal, Trade Finance can hardly claim that it caused Northwest to award business to AAR Allen.

Trade Finance's fundamental problem in this case is that it cannot support its argument that it secured the

Northwest Contract. The evidence in the record, even when viewed in the light most favorable to Trade Finance, indicates that Northwest rejected Trade Finance's propositions and independently awarded the Northwest Contract to AAR Allen.

4.  *Trade Finance did not facilitate Northwest's visit to AAR Allen's New York facility.*

Finally, Trade Finance asserts that (1) it caused Northwest to schedule a site visit to AAR Allen's New York facility, and (2) the visit caused Northwest to award its contract to AAR Allen. But Trade Finance can support neither assertion. First, there is no evidence that Trade Finance caused Northwest to schedule a site visit. For all the district court knew, Northwest might have scheduled a visit for every company that submitted a bid for the Northwest Contract. But more importantly, *even if* we accept that Trade Finance caused Northwest to schedule the visit, Trade Finance has not demonstrated that the visit influenced Northwest's decision. Trade Finance presented no evidence about the visit, despite having deposed both Johnson and Reidlinger. Trade Finance did not ask whether Trade Finance played a role in scheduling the visit, what factors Northwest typically considered when visiting a site, what Northwest may have discovered when it toured AAR Allen's facility, what Northwest and AAR Allen might have discussed at that time, or whether the visit had any impact on the decision to award the Northwest Contract.

*   *   *

Of course, we must construe all reasonable inferences from the evidence in Trade Finance's favor. *See Jones*, 554 F.3d at 671. And we have entertained all of Trade Finance's arguments, despite our finding that—even assuming that many of its assertions are true—it cannot support the pivotal fact that it "secured" the Northwest Contract. After lengthy discovery and thorough briefing, however, Trade Finance simply cannot produce anything but speculation that it caused Northwest to award business to AAR Allen. The undisputed facts show that AAR Allen submitted two bids for avionic, hydraulic, and pneumatic services without Trade Finance's involvement and without referring to Trade Finance's business model. Trade Finance has not demonstrated that Northwest was disinclined to award work to AAR Allen, nor has Trade Finance produced evidence that it discussed the terms of the Northwest Contract with Northwest. Had Trade Finance engaged in such discussions, it should have had ample evidence of its role in procuring the contract on AAR Allen's behalf. To the contrary, the record suggests that AAR Allen realized it was *not* competitive for the Northwest Contract using Trade Finance's approach, and it chose instead to reduce its prices to secure that business.

The parties' Agreement required Trade Finance to do more than merely contact or proposition Northwest, or "facilitate" communication or a site visit. The picture painted by the record is not one in which AAR Allen took advantage of Trade Finance's efforts on its behalf, but one in which Trade Finance attempted to benefit from a contract that AAR Allen secured on its own. In a

business arrangement so reliant on documentation, Trade Finance left too many t's uncrossed and i's undotted. From this record, no reasonable juror could find that Trade Finance secured the Northwest Contract on AAR Allen's behalf.

### B. *Alternative Basis for Breach of Contract Claim*

Trade Finance also argued below that AAR Allen breached the Agreement by failing to complete an RFI for the Northwest account. The district court found that Trade Finance waived this claim by raising it for the first time in its sur-reply during summary judgment proceedings and that, regardless, the claim failed on the merits because Trade Finance did not identify damages resulting from the breach. Trade Finance challenges both decisions.

First, the district court did not err by concluding that Trade Finance waived this alternative basis for its breach claims by raising it for the first time in its sur-reply during summary judgment proceedings. *See Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." (quotations omitted)).

Trade Finance attempts to overcome waiver by pointing to a single mention of AAR Allen's refusal to complete an RFI in the facts section of its complaint, claiming that its allegation met our notice-pleading requirements. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing Fed. R. Civ. P. 8(a)(2)). But Trade

Finance confuses a motion to dismiss and summary judgment. Even if the reference to AAR Allen's action would have survived a motion to dismiss, Trade Finance was required to present more than a mere allegation to survive summary judgment—it must point to evidence creating a genuine issue of material fact. *See Burrell v. City of Mattoon*, 378 F.3d 642, 648 (7th Cir. 2004) ("[M]ere allegations in the pleadings, unsupported by record evidence, cannot create an issue of fact defeating summary judgment."). After lengthy discovery, raising an alternative basis for its breach of contract claim in its sur-reply was inadequate.

Second, and more importantly, even if Trade Finance did not waive this claim, it fails on the merits for the same reason that Trade Finance's other breach claims fail. Trade Finance is entitled to compensation only if it "secured" the Northwest Contract. According to Trade Finance, it *treated* Northwest as a Target Account, which is precisely what a completed RFI would have formalized. AAR Allen refused to pay Trade Finance because it did not secure Northwest's business, not because a formal Target Account RFI was missing. Had Trade Finance secured the contract, and AAR Allen's sole basis for refusing to pay was the lack of an RFI, then our analysis might be different. But without securing the contract, Trade Finance's claims based on this theory must also fail.

### C.  Fraud Claim

In addition to its breach of contract claims, Trade Finance alleged that AAR Allen engaged in fraud by falsely promis-

ing that it would complete an RFI identifying Northwest as a Target Account. Trade Finance, relying on this promise, treated Northwest as a Target Account, even without written confirmation, and continued to solicit Northwest's business. The district court granted summary judgment, and we agree that it was merited.

A plaintiff alleging fraud must prove by clear and convincing evidence that (1) the defendant made a false statement of material fact; (2) the defendant knew that the statement was false; (3) the defendant intended that the statement induce plaintiff to act; (4) the plaintiff justifiably relied upon the statement's truth; and (5) the plaintiff suffered damages as a result of relying on the statement. *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 881-82 (7th Cir. 2005) (applying Illinois law); *see also City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 454 (2d Cir. 2008) (applying New York law).[10]

Trade Finance's fraud claim fails for a number of reasons. First, promissory fraud, i.e., a false statement of intent regarding future conduct rather than present or past facts, "is generally not actionable under Illinois law unless the plaintiff also proves that the act was a part of a scheme to defraud." *Ass'n Benefit Servs., Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007) (citing *Bradley*

---

[10] Although the Agreement is governed by New York law, the parties did not address the governing law for Trade Finance's fraud claims. The district court, however, noted that the elements for a common law fraud claim are the same under Illinois and New York law, and it held that summary judgment was appropriate under the laws of either state.

*Real Estate Trust v. Dolan Assocs. Ltd.*, 640 N.E.2d 9, 12-13 (Ill. App. Ct. 1994)). Similarly, under New York law, "[t]hough misrepresentations of present or past fact have the potential to create liability for the speaker, '[m]ere unfulfilled promissory statements as to what will be done in the future are not actionable.'" *Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 253 (S.D.N.Y. 2008) (quoting *Brown v. Lockwood*, 432 N.Y.S.2d 186, 194 (N.Y. App. Div. 1980)). Trade Finance has not alleged, much less proven, a scheme by AAR Allen to defraud it, nor has it identified any misrepresentation apart from an unfulfilled promissory statement.

Second, Trade Finance has produced no evidence, other than AAR Allen's mere failure to complete a Target Account RFI, that AAR Allen did not intend to fulfill its promise at the time it executed the Agreement. Neither Illinois nor New York law "allow[s] the plaintiffs to proceed on a fraud claim when the evidence of intent to defraud consists of nothing more than unfulfilled promises and allegations made in hindsight." *Caremark Rx*, 493 F.3d at 853 (applying Illinois law); *see also Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) (applying New York law and distinguishing between a promissory statement of future conduct, which gives rise only to a breach of contract claim, and a misrepresentation of present fact collateral to the contractual obligations, which permits a fraudulent inducement claim); *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 434 (2d Cir. 1995) ("A cause of action for fraud does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing.").

Trade Finance has alleged nothing more than an unful-filled contractual promise and has not provided any evidence that AAR Allen did not intend to perform its obligations at the time it signed the Agreement. Its fraud claim must fail.

### D. *Quantum Meruit*

Last, to the extent that Trade Finance requests *quantum meruit* recovery for the work it performed as a result of AAR Allen's allegedly fraudulent statements, this dispute is fully governed by the parties' contract. When a contract governs the parties' relations on a particular issue, a party may not recover in quasi-contract for events arising out of the same subject matter. *Keck Garrett & Assocs. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008); *see also Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006). The Agreement, which fully governs the parties' relation-ship, expressly states that Trade Finance is entitled to payment only if it secures an executed contract for AAR Allen. It has not done so.

### III.  CONCLUSION

The frequency of the phrase "even if" in our opinion is indicative of the multiple leaps we would be required to take to find in Trade Finance's favor. The record, however, does not provide us a platform from which to jump. Trade Finance is not entitled to payment under its agreement with AAR Allen because no reasonable juror could find

that it secured the Northwest Contract for AAR Allen. Trade Finance's additional claims fail as well, and we AFFIRM.