Nathan ALLISON, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 09–cv–3341.

United States District Court, C.D. Illinois, Springfield Division.

Feb. 21, 2013.

Hillary W. Frooman, Asst. U.S. Atty., U.S. Attorney's Office, Springfield, IL, for Plaintiff.

Randall A. Wolter, Wolter, Beeman & Lynch, Springfield, IL, for Defendant.

## *OPINION*

RICHARD MILLS, District Judge:

A high school senior claims he was injured while sparring against an Army re-

cruiter during a martial arts demonstration during a school gym class.

However, the contact sports exception to tort liability applies.[1]

Summary judgment must be entered for the United States.

## I.

In October 2007, two U.S. Army recruiters—Staff Sergeants Gary A. Roth and Mark White—were actively looking for opportunities to speak with young people regarding serving in the Armed Forces.

Roth and White were invited to spend a day with the physical education classes at Virden High School,[2] Virden, Illinois. During the day they would be demonstrating the Modern Army Combatives Program—a program primarily based on Brazilian jiu jitsu that the Army uses to prepare soldiers for hand-to-hand combat.

The recruiters arrived on the morning of October 17, 2007, and prepared for the day by placing the school's mats on the floor. Roth and White demonstrated the basic positions and techniques, and had the students pair up and practice with their partners. The parties dispute whether Roth and White specifically told the students that the use of the "armbar" technique would be prohibited, while agreeing that the recruiters did prohibit hitting, choking, or hurting others.

One of the students in attendance was Plaintiff Nathan Allison. Allison, who was seventeen at the time, had become familiar with mixed martial arts from watching televised matches. During the first portion of the class period, Allison had done well against his peers.

Eventually, the recruiters asked for volunteers to demonstrate in front of the entire class. Allison willingly accepted the invitation, and issued a challenge to Roth, stating that he could easily force Roth into submission.

The two began sparring, and Allison was unable to force Roth into submission. After a minute or two, Allison began to get frustrated and started to thrash about carelessly. Allison then became aggressive and began to dig his elbows into Roth's inner thigh, getting close to Roth's genital area. The recruiters recognized this as a jiu jitsu move. Allison also began pressing on and striking Roth's chin in an aggressive fashion, and Roth became concerned because he did not have a mouth guard.

Roth decided that it was time to stop the demonstration, so he used the armbar technique against Allison—taking Allison's extended arm and rotating it straight backwards so as to put pressure on Allison's shoulder. Roth testified that the arm was not twisted behind Allison's back.

Allison communicated his submission by tapping the floor.

Following the match, Roth shook Allison's hand and ensured that he was alright. Allison and Roth discussed opportunities in the Army for several minutes before the class period ended. Allison did not indicate to the recruiters that he was in any pain at that time.

Allison stated under oath that his shoulder was tender immediately after sparring with Roth.

---

1. "The contact sports exception precludes liability for negligence associated with an injury caused by a risk associated with engaging in a contact sport, i.e., a risk inherent in the sport. It does not insulate a defendant from negligence liability for injuries arising from circumstances that are outside the context of physical play and are not inherent in the play of the game." 30A C.J.S. *Entertainment & Amusement* § 96 (2013) (footnotes omitted).

2. Virden High School no longer exists. Virden and Girard merged their school districts to become the North Mac School District.

Allison fully participated in his physical education class in the days and weeks after the recruiters visited.

A short time later the high school basketball season began, and Allison was a member of Virden High School's team. During the month of November in 2007, he felt his shoulder pop in practice on one occasion, and at a different time that month, his shoulder was slammed into a wall while playing basketball. During that period he alternatively played through the pain, took pain relievers, used ice, and sat out from basketball.

Eventually, he sought medical attention, and the documentation associated with his visits reflects that either Allison or his mother initially reported that he was seeking treatment following a basketball injury.

Eventually, he consulted with a specialist, who performed surgery on the shoulder in late December 2007. The specialist would later conclude that Roth's application of the armbar, combined with being slammed into a wall during basketball practice, led to Allison's injury.

## II.

Allison filed an administrative claim with the Army on November 3, 2008. The administrative claim was denied on July 2, 2009.

On December 30, 2009, this Federal Tort Claims Act case was initiated against the United States, Roth, and White. Allison made the same two claims against each of the three Defendants—one negligence claim and one wanton conduct claim. In the Complaint, Allison alleged that the incident occurred at a non-sanctioned, non-school sponsored wrestling match, that Roth and/or White violated the rules of the match, that they were negligent, and that the activities were carried out without parental consent. Allison alleged that the Defendants breached their duty of ordinary care.

On April 9, 2010, the United States filed a Westfall Act certification executed by the United States Attorney, stating that Roth and White were acting within the scope of their job duties at the time the incident occurred. *See* 28 U.S.C. § 2679; 28 C.F.R. § 15.4. The Court allowed the United States' motion to enter judgment in favor of Roth and White, on the basis of the pleadings and the Westfall Act certification.

On June 22, 2011, the United States filed a Motion for Summary Judgment, claiming that it was entitled to judgment because the contact sports exception to tort liability precludes any recovery. Allison requested permission to file an amended complaint which would have altered the nature of the claim—instead of a wrestling match that was not approved by the school, Allison argued that the recruiters were teaching a class and the activities were not covered by the contact sports exception. The Court denied the request to file the amended complaint on March 28, 2012.

## III.

"Summary judgment is appropriate when the evidence submitted, viewed in the light most favorable to the non-moving party, shows 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Smith v. Hope School,* 560 F.3d 694, 699 (7th Cir.2009) (quoting Fed.R.Civ.P. 56(c) and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In order to survive summary judgment, there must be sufficient evidence that a reasonable factfinder could return a verdict for the nonmoving party. *Trade Finance Partners, LLC v. AAR Corp.,* 573 F.3d 401, 406–407 (7th Cir.2009).

"[A] motion for summary judgment requires the responding party to come forward with the evidence that it has—it is the 'put up or shut up' moment in a lawsuit." *Eberts v. Goderstad,* 569 F.3d 757, 767 (7th Cir.2009) (quotation marks omitted). Although inferences are drawn in favor of the nonmoving party, inferences relying on speculation or conjecture are insufficient. *Stephens v. Erickson,* 569 F.3d 779, 786 (7th Cir.2009).

### IV.

### A.

In cases arising under the Federal Tort Claims Act, the United States is liable for injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Therefore, in this case, the tort laws of the State of Illinois apply. *See Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

### B.

■ The U.S. Court of Appeals for the Seventh Circuit has explained the contact sports exception as follows:

Illinois courts have established the "contact sports exception" to negligence. Under this exception, voluntary participants in contact sports may be held liable for injuries to co-participants caused by wilful and wanton or intentional misconduct, but they are not liable for injuries caused by ordinary negligence. *Nabozny v. Barnhill,* 31 Ill. App.3d 212, 334 N.E.2d 258, 260–61 (Ill.

App.Ct.1975); *Oswald v. Twp. High Sch. Dist. No. 214,* 84 Ill.App.3d 723, 40 Ill. Dec. 456, 406 N.E.2d 157, 159–60 (Ill. App.Ct.1980). "[A] player is liable for injury in a tort action if his conduct is such that it is either deliberate, wilful or with a reckless disregard for the safety of the other player so as to cause injury to that player...." *Nabozny,* 334 N.E.2d at 261. The parties agree the exception has been expanded to include unorganized, informal, and spontaneous sports activities. *See Pfister v. Shusta,* 167 Ill.2d 417, 212 Ill.Dec. 668, 657 N.E.2d 1013, 1014–15, 1018 (Ill.App.Ct. 1995) (applying exception to spontaneous game of kick-the-can in college dormitory); *Landrum v. Gonzalez,* 257 Ill. App.3d 942, 196 Ill.Dec. 165, 629 N.E.2d 710, 715 (Ill.App.Ct.1994) (applying exception to informal company softball game).

... The situation arose during a martial arts event. Bevolo had been coming to this same location for some time to engage in martial arts training, where physical contact with other participants was the norm. Carter was a master and instructor in the martial arts, a role that Bevolo and all the other attendees were aware. The entire evening was organized for the members of this particular group. The attendees were actually engaged in martial arts training that night, warming up, sparring with each other, and discussing Carter's role as master. A reasonable person would have understood in this context that the particular form of martial art being taught ... inherently involved physical contact.

*Bevolo v. Carter,* 447 F.3d 979, 982 (7th Cir.2006).

■ So, the contact sports exception can only be avoided if it can be demonstrated that the action was willful or wanton.[3]

---

3. "By allowing recovery for injuries resulting    from willful and wanton and intentional mis-

Since the Seventh Circuit decided *Bevolo,* the Supreme Court of Illinois has expanded the exception even further in *Karas v. Strevell,* 227 Ill.2d 440, 318 Ill.Dec. 567, 884 N.E.2d 122 (2008). In *Karas,* a minor was body-checked from behind by two opposing players, causing serious neck and head injuries. *Id.* at 444, 318 Ill.Dec. 567, 884 N.E.2d 122. There was a rule against body-checking opponents, and the word "STOP" had been sewn on the back of each players' jersey to remind them that body-checking from behind was against the rules. *Id.* The court held that dismissal of the claims, as alleged, was appropriate because the conduct fell within the contact sports exception. *Id.* at 443, 318 Ill.Dec. 567, 884 N.E.2d 122.

The court explained that in violent contact sports, a violation of the rules does not mean that conduct was willful or wanton, even if serious injury results:

> In considering the appropriate standard of care to be followed, we note that a majority of courts have concluded that rules violations are inherent and anticipated aspects of sports contests and, thus, insufficient to establish liability by themselves. As this court observed ..., in numerous sports, players regularly commit contact beyond that which is permitted by the rules even as applied. In basketball, such an illegal contact is described as a foul for which a sanction is imposed. Sometimes the player fouled is injured. This is to be expected.

> Policy reasons also justify the holding that rules violations, by themselves, are insufficient to impose liability in a con-

tact sport[.] Even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of legal liability for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule.

At the same time, courts have uniformly recognized that not all misconduct can be considered an inherent aspect of the sport being played. Some of the restraints of civilization must accompany every athlete on to the playing field.

Courts have expressed a standard of care that balances these concerns and, in particular, acknowledges the risks inherent in certain sports, in various ways. Perhaps the most frequently cited standard is that adopted by the Supreme Court of California ... There, the court stated that a participant breaches a duty of care to a co-participant only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport. Regardless of the precise wording, these standards all draw a line in a way that permits recovery for extreme misconduct during a sporting event that causes injury, while at the same time foreclosing liability for conduct which, although it may amount to an infraction of the rules, is nevertheless an inherent and inevitable part of the

conduct, but not ordinary negligence, the contact sports exception takes into account the voluntary nature of participation in games where physical contact is anticipated and where the risk of injury caused by the contact is inherent. Thus, ... the contact sports exception strikes an appropriate balance between society's interest in limiting liability for

injuries resulting from physical contact inherent in limiting liability for injuries resulting from willful and wanton or intentional misconduct by participants." *Weisberg v. Chicago Steel,* 397 Ill.App.3d 310, 313, 337 Ill.Dec. 366, 922 N.E.2d 489 (2d Dist.2009) (citations and quotation marks omitted).

sport. We ... conclude that, in a full contact sport such as ice hockey or tackle football, a participant breaches a duty of care to a co-participant only if the participant intentionally injures the co-participant or engages in conduct totally outside the range of the ordinary activity involved in the sport.

. . .

... However, as noted, rules violations are considered an inherent, unavoidable risk of playing a contact sport....

*Id.* at 457–60, 318 Ill.Dec. 567, 884 N.E.2d 122 (citations, quotation marks, and alterations omitted).

### V.

After carefully considering the parties filings and the documents on file, the Court concludes that the contact sports exception applies, and that Roth's conduct was not willful or wanton.

### A.

█ Roth and Allison were engaged in martial arts sparring when the incident took place. The record establishes that this discrete event (the actual sparring) was a competitive contact sports event, even though it place took place as part of a seminar or demonstration.

█ The informal nature of the bout, the relative size of the participants, the relative ages of the participants, and the relative experience of the participants are not relevant to the analysis of the contact sports exception.

Looking at the facts in the light most favorable to Allison, at most (1) Roth and White established a rule at the outset of the class period that the armbar would not be permitted, and (2) Roth violated this rule and caused injury to Allison's shoulder as a result. Under these presumed facts, the United States is not liable.

█ Violating the rules of an athletic event to win does not lead to tort liability. *Karas,* 227 Ill.2d at 457–60, 318 Ill.Dec. 567, 884 N.E.2d 122.

In *Karas, id.* at 458, 318 Ill.Dec. 567, 884 N.E.2d 122, the Illinois Supreme Court quoted favorably the following passage from *Jaworski v. Kiernan,* 241 Conn. 399, 408, 696 A.2d 332 (1997): "In athletic competitions, the object obviously is to win. In games, particularly those played by teams and involving some degree of physical contact, it is reasonable to assume that the competitive spirit of the participants will result in some rules violations and injuries. That is why there are penalty boxes, foul shots, free kicks, and yellow cards." The record demonstrates that Roth used the armbar for a competitive advantage—it enabled him to force Allison to submit so the match could end.

█ The record further demonstrates that the armbar technique was known to both Roth and Allison, as a technique employed in either the Modern Army Combatives Program, Brazilian jiu jitsu, or mixed martial arts. Even cursory research confirms that the armbar is a key technique in these interrelated martial arts: "[The armbar] is used in various grappling martial arts, including but not limited to Brazilian jiu-jitsu, catch wrestling, judo, jujutsu, Sambo, and shoot wrestling, and is one of the most common ways to win a match in mixed martial arts competition." Wikipedia, *Armlock,* http://en.wikipedia.org/wiki/Armlock (last visited Feb. 12, 2013). When a move or technique is a fundamental part of a contact sport, its application at an improper time or with extraordinary force does transform it into a tort. *See Karas,* 227 Ill.2d at 455–457, 318 Ill.Dec. 567, 884 N.E.2d 122 (explaining that body-checking and tackling are an inherent part of hockey and football, and that a player should not be held liable for

committing conduct that is inherent in the contact sport).

### B.

 The recruiters' actions were not willful or wanton. Their actions would so qualify only if they intentionally injured Allison or they engaged in conduct totally outside the ordinary range of activity found in martial arts. *See Karas,* 227 Ill.2d at 459, 318 Ill.Dec. 567, 884 N.E.2d 122. Viewing the record in the light most favorable to Allison, the Court cannot conclude that White or Roth did so. Roth used a standard technique to prevail and end the match. There is nothing in the record to suggest that he knew or could have known that he was injuring Allison when applying the armbar. He questioned Allison after they sparred to make sure Allison was alright. At the end of the class period Roth discussed opportunities in the Army with Allison. Therefore, the Court concludes that the behavior was not willful or wanton.

### VI.

*Ergo,* the Defendant's Motion for Summary Judgment is ALLOWED. Judgment is hereby entered for Defendant United States and against Plaintiff Nathan Allison.

The Defendant's Motion in Limine is DENIED AS MOOT.

CASE CLOSED.

IT IS SO ORDERED.