In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-4060

MMG FINANCIAL CORPORATION,

*Plaintiff-Appellee,*

*v.*

MIDWEST AMUSEMENTS PARK, LLC,
KAL GRONVALL, DR. R.C. SAMANTA ROY
INSTITUTE OF SCIENCE AND TECHNOLOGY,
INC. and U.S. ACQUISITIONS & OIL, INC.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 06-C-929—**William C. Griesbach**, *Judge.*

ARGUED APRIL 16, 2010—DECIDED JANUARY 5, 2011

Before EASTERBROOK, *Chief Judge*, FLAUM, *Circuit Judge*, and HIBBLER, *District Judge*.[*]

HIBBLER, *District Judge*. A tangled web of corporate relationships and oral promises lies at the center of this

---

[*] The Honorable William J. Hibbler, District Judge for the Northern District of Illinois, sitting by designation.

contract dispute. In short, Midwest Amusements Park, LLC (Midwest) purchased 24 go-karts from Team Hurricane, Inc. (Team Hurricane), which MMG Financial Corporation (MMG) financed. When the go-karts did not meet Midwest's expectations, it refused to pay for them. This litigation followed.

## I.

In early 2005, Kal Gronvall attended a go-kart trade show in Chicago on Midwest's behalf.[1] At the show, Gronvall met a salesman of Team Hurricane, Lorne Kelly. Team Hurricane was a joint venture between Cameron Motorsports, Inc. (Cameron Motorsports) and MMG.[2] Kelly promoted go-karts branded by Cameron

---

[1] Gronvall operated Midwest's racetrack, USA International Raceway. Midwest's sole member is the Dr. R.C. Samanta Roy Institute of Science and Technology (SIST), another of the Defendants. MMG added SIST (and also U.S. Acquisitions & Oil, Inc. (USAO)) in an amended complaint, fearing that Midwest had fraudulently transferred some of its assets. When Gronvall and Midwest filed this appeal, MMG had moved for default judgment against SIST and USAO, but the district court had not yet ruled on the motion. Finding no just reason to delay Gronvall's and Midwest's appeal, the district court certified the entry of final judgment against Gronvall and Midwest pursuant to Fed. R. Civ. P. 54(b).

[2] The trial testimony makes clear that while Malcolm McMaster and Bob Cameron, MMG's and Cameron Motorsports'

(continued...)

Motorsports, which were manufactured by CRG Spa (CRG), an Italian Corporation. Thus, Cameron branded the go-karts, Team Hurricane sold the go-karts, and MMG financed Team Hurricane's customers' purchases.

Shortly after the trade show, Kelly traveled to Midwest's racetrack in Shawano, Wisconsin, in hopes of selling go-karts to Midwest. Malcolm McMaster, MMG's president and sole shareholder, traveled with Kelly. McMaster, however, attended the Wisconsin meeting as a representative of Team Hurricane, unaware that Midwest intended to finance its purchase.

Kelly touted the "arrive and drive" program, in which the go-karts sold by Team Hurricane would be available for customers to test their racing skills on Midwest's racetrack. Additionally, Kelly implied that as part of the arrive and drive program, Cameron Motorsports would completely assemble the go-karts, break-in the go-karts' engines, supply training materials for Midwest's staff, and provide service for the go-karts. At the conclusion of the meeting, Midwest indicated to Kelly and McMaster that it might be interested in short-term financing for the purchase it would later make.

---

[2] (...continued)
respective sole shareholders, once embraced the Team Hurricane partnership, they had a significant falling-out. Their dispute revolves around the handling of Team Hurricane's finances, with each believing that the other had improperly diverted money from Team Hurricane's accounts.

In April 2005, Midwest ordered 24 go-karts at a purchase price of $89,502.12. Shortly thereafter, Gronvall contacted MMG to discuss financing the purchase. According to MMG, McMaster and Gronvall agreed to a contract to finance the purchase. MMG sent Gronvall a "conditional sales agreement" that documented the parties' oral agreement. That sales agreement identifies Gronvall and USA International Raceway (the name under which Midwest did business) as the buyers, MMG as the finance company, and Team Hurricane as the dealer. The sales agreement specifies a purchase price of $89,502.12, and calls for Midwest to make 24 monthly payments of $4,468.31, which amounts to a steep 24% annual percentage rate.

Gronvall never signed the agreement. Nevertheless, the go-karts arrived directly from CRG several months later. Soon after Midwest received the go-karts, Gronvall voiced several complaints. He complained to Cameron Motorsports and CRG that the go-karts did not perform as expected. Gronvall informed the companies that some of the go-karts "blew-up" upon first being driven and others no longer worked. Cameron Motorsports only grudgingly responded to Gronvall's complaints. Gronvall also complained to MMG that the previously agreed upon interest rate was too onerous.

Gronvall and MMG dickered over a revised interest rate. Gronvall requested that MMG lower the annual percentage rate. MMG responded that it might lower the annual percentage rate to 18% if Midwest caught up on missed payments. Gronvall eventually created and

signed a sales agreement that called for a 12% annual percentage rate and conditioned payments on a portion of Midwest's revenue from USA International Raceway. MMG never signed the agreement created by Gronvall, and neither Gronvall nor Midwest made any payments to MMG.

By June 2006, Midwest still had not made any payments to MMG. MMG filed suit, alleging a breach of contract, naming Midwest and Gronvall as co-defendants. Midwest filed a counterclaim, in which it alleged that MMG had breached the finance agreement by failing to pay Cameron Motorsports for the go-karts. Midwest also claimed that MMG breached both express and implied warranties because the go-karts did not function properly. Midwest did not file a third-party complaint against Cameron Motorsports, Team Hurricane, or CRG raising the same breach of warranty claims. The district court granted MMG's motion for summary judgment on Midwest's counterclaim, and MMG's claim proceeded to the jury.

At trial, Midwest and Gronvall denied that they had agreed to any contract with MMG. In the alternative, Midwest raised an affirmative defense, arguing that it was entitled to a set-off because MMG had failed to pay Cameron Motorsports for the go-karts, which in turn caused Cameron Motorsports to refuse to service the malfunctioning go-karts. The parties presented testimony, mostly from McMaster and Gronvall, regarding the details of Midwest's and MMG's agreement (or the absence thereof). Midwest also elicited testimony from Bob Cameron in an attempt to persuade the jury

to award it a set-off of any amount it owed to MMG. During Cameron's testimony, Midwest sought to introduce an e-mail that Cameron Motorsports had received from CRG purporting to demonstrate that the go-karts that had been shipped to Midwest had not been paid for. The district court excluded the e-mail, concluding that it constituted hearsay. At the end of the trial, the jury credited MMG's evidence and found that the parties had orally agreed on a contract with a 24% annual percentage rate.

Midwest raises five arguments on appeal.[3] First, Midwest argues that the district court erred in granting MMG summary judgment on its counterclaim. Second, Midwest argues that the district court erred in refusing to admit the e-mail from CRG to Cameron Motorsports that summarized outstanding invoices. Third, Midwest argues that the district court erred in failing to give a statute of frauds or usury instructions. Fourth, Midwest argues that the district court's special verdict was flawed. Fifth, Midwest argues that the jury's verdict was against the manifest weight of the evidence.

## II.

*A. Summary Judgment Order*

We first address the district court's entry of summary judgment in favor of MMG on Midwest's counterclaim.

---

[3] Gronvall joins in Midwest's arguments. For convenience's sake, we hereafter refer to the appellants collectively as Midwest.

In opposition to MMG's motion for summary judgment, Midwest argued that MMG failed to pay Cameron Motorsports for the go-karts and therefore breached the financing agreement. In support of this argument, Midwest relied entirely on two letters it received from Cameron Motorsports in which Cameron Motorsports claimed it had not been paid for the go-karts and deposition testimony from its employees containing similar assertions. The district court excluded Midwest's evidence on hearsay grounds. The district court further held that MMG had presented evidence—in the form of testimony from McMaster and receipts attached to a declaration—that it had paid Cameron Motorsports for the go-karts. The district court concluded that Midwest had failed to offer proof that MMG had breached the financing agreement and granted MMG's motion for summary judgment.

When a district court's grant of summary judgment is premised upon an evidentiary finding, we use a combined standard of review. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). We review the district court's determination that a particular statement is inadmissable as hearsay for abuse of discretion. *Id.* We then review the grant of summary judgment *de novo* and construe all facts in the light most favorable to the non-moving party. *Id.*; *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406 (7th Cir. 2009). To survive summary judgment, a party must point to specific facts showing that there is a genuine issue for trial. *Trade Fin. Partners, LLC*, 573 F.3d at 406-07.

A party may not rely on inadmissible hearsay to avoid summary judgment. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). The evidence Midwest offered to establish that MMG had failed to pay Cameron Motorsports for the go-karts is classic hearsay. Rather than offer the sworn testimony of a Cameron Motorsports employee (the declarant), Midwest instead offered only the testimony of its own employees repeating what Cameron Motorsports had told them. Similarly, Midwest offered an unsworn statement, in the form of the letter, from the declarant. Midwest offered these statements to prove the truth of the matter asserted, namely that MMG had not paid Cameron Motorsports for the go-karts shipped to Midwest. The district court correctly points out that the sworn testimony of a Cameron employee would have been easy to obtain if Midwest's assertions were true. Midwest makes no discernable argument that the district court's evidentiary ruling was incorrect, and the district court correctly excluded the evidence.

Nonetheless, Midwest argues that the district court erred in granting MMG summary judgment on Midwest's breach-of-contract claim. Midwest makes a curious argument that the evidence it presented at trial demonstrates that the grant of summary judgment was in error. Our review of the district court's summary judgment order, however, is limited to the record presented to the district court at that time. *Joseph P. Caulfield & Assoc., Inc. v. Litho Prod., Inc.*, 155 F.3d 883, 888 (7th Cir. 1998).

Midwest also attacks the evidence MMG submitted in support of its claim that it fulfilled the terms of its

contract. Midwest suggests that to succeed on summary judgment MMG must "demonstrate that the monies were paid to [Cameron Motorsports]." Midwest, however, conflates the burden MMG bears in proving its own breach-of-contract claim, which was not decided on summary judgment, with its burden as the party moving for summary judgment on Midwest's breach-of-contract counterclaim. A party seeking summary judgment bears an initial burden of proving there is "no material question of fact with respect to an essential element of the non-moving party's case." *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009). MMG met this burden by pointing to the absence of any evidence to establish that it had materially breached the parties' finance agreement, an essential element of Midwest's breach-of-contract claim. Once MMG met its burden on summary judgment, Midwest bore the burden of pointing to evidence raising a genuine issue of material fact. *Trade Fin. Partners, LLC*, 573 F.3d at 406-07. Because Midwest had relied solely on the excluded hearsay evidence to prove that MMG had materially breached the contract, it did not point to evidence necessary to stave off summary judgment, and the district court did not err in granting MMG's motion.

Midwest also argues that the district court erred in granting MMG summary judgment on its breach of warranty claims against MMG. At summary judgment, Midwest argued that MMG warranted the defective go-karts. The district court rejected that argument, noting that Team Hurricane was the dealer that sold Midwest the go-karts and MMG was the company that financed

Midwest's purchase. Midwest raised no rational argument either before the district court or on appeal that a finance company warrants the goods that it finances.

Instead, Midwest argues that MMG should be responsible for Team Hurricane's breaches of warranty because they share an ownership interest. MMG and Team Hurricane are distinct corporations, however, and not responsible for each others' liabilities merely because they share a corporate relationship. *Wiebke v. Richardson & Sons, Inc.*, 83 Wis. 2d 359, 363-64, 265 N.W.2d 571, 573-74 (Wis. 1978). Midwest offers no reason why we should disregard the corporate form, and the district court did not err in granting MMG summary judgment on Midwest's breach of warranty claims.

### B.  CRG E-Mail

During trial, Midwest reanimated its defeated breach of contract counterclaim, raising it instead as an affirmative defense. Midwest argued that MMG never fulfilled its obligations to pay Team Hurricane for the go-karts that it purchased causing Team Hurricane and Cameron Motorsports to refuse to provide support for the go-karts when they malfunctioned. Midwest thus reasoned that it was entitled to a set-off of the amounts it owed to MMG.

On appeal, Midwest argues that the district court improperly excluded an e-mail sent by CRG to Cameron Motorsports that it offered in support of its affirmative defense. In order to show that it is entitled to relief

because of the exclusion of evidence, Midwest must not only show that the district court erred, but also that the error affected its substantial rights. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004); Fed. R. Civ. P. 61.

Midwest's argument revolves around its misapprehension that MMG and Team Hurricane should be treated as a single entity merely because they shared common ownership. Midwest sought to introduce an e-mail that CRG had sent to Cameron Motorsports, which purported to indicate that CRG had not received payment for the go-karts shipped to Midwest. At best, the CRG e-mail demonstrates that Cameron Motorsports owed CRG money for the go-karts. Midwest, however, purchased go-karts from Team Hurricane, thereby incurring a debt to Team Hurricane that MMG agreed to pay. MMG's contract with Midwest did not obligate it to pay Cameron Motorsports' debt to CRG. Rather, it obligated MMG to pay MMG's debt to Team Hurricane. Whether Cameron Motorsports paid its debt to CRG bears no relation to the question of whether MMG paid Midwest's debt to Team Hurricane. The mere fact that McMaster had an ownership interest in MMG and Team Hurricane does not alter MMG's obligations under the finance agreement. Therefore, the CRG e-mail simply is not relevant to Midwest's affirmative defense.

Midwest's argument seems to find its origin in the dispute between McMaster and Cameron. As noted earlier, McMaster and Cameron each believed the other owed him money. Cameron testified that he believed that McMaster, perhaps in his role at Team Hurricane or

as an accountant for Cameron Motorsports, caused Cameron Motorsports to fail to pay its bill to CRG. But it does not logically follow that because McMaster caused Cameron Motorsports to fail to pay its bill to CRG that MMG did not pay Midwest's bill to Team Hurricane.

Because the CRG e-mail is not relevant to Midwest's affirmative defense, Midwest cannot demonstrate that its exclusion affected its substantial rights, and we need not decide whether the e-mail was hearsay. We also can put aside the issue of whether the district court's factual findings on MMG's summary judgment motion precluded Midwest from raising this defense in the first instance.

*C. Jury Instructions and Verdict Form*

Midwest's arguments concerning jury instructions and the special verdict form merit scant discussion. Midwest suggests that the district court erred in failing to provide a usury instruction. But it did not request such an instruction and has waived any argument that related to such an instruction. *Jabat, Inc. v. Smith*, 201 F.3d 852, 857 (7th Cir. 2000) (party who fails to request jury instruction has waived issue for appeal). Midwest also argues that the district court erred in failing to provide a statute of frauds instruction. But the contract between Midwest and MMG was a finance agreement, and not one for a sale of goods, so the statute of frauds is not applicable. *See ReMapp Int'l Corp. v. Comfort Keyboard Co.*, 560 F.3d 628, 632-33 (7th Cir. 2009)

(applying Wis. Stat. § 402.21). Midwest argues that the special verdict form did not contain separate questions about the elements necessary to form a contract. Midwest did not object to the special verdict form on these grounds, and so has waived this argument as well. *Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 477-78 (7th Cir. 1997) (party who fails to alert judge to objections to special verdict questions has waived such objections).

### D. Motion for a New Trial

Finally, Midwest presents a cursory argument that the district court erred in refusing to grant its motion for a new trial. Midwest devotes less than a single page of text in its 43-page brief developing this argument. Federal Rule of Appellate Procedure 28 requires that an argument consist of more than a generalized assertion of error, mandating that it contain "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(9)(A). Midwest's argument contains no authority—other than authority to report our standard of review—and cites to nothing in the record in support of its argument that the district court should have granted it a new trial. Rather, Midwest presents only general (and largely inaccurate) references to testimony and evidence. Arguably, Midwest has waived the issue with its cursory treatment. *See Vaughn v. King*, 167 F.3d 347, 353 (7th Cir. 1999) (cursory arguments with no analysis are waived).

Even if its cursory treatment of the issue has not resulted in a waiver, Midwest's failure to present its argument to the district court does result in a waiver of that argument. *Brown v. Auto. Components Holdings, LLC*, 622 F.3d 685, 691 (7th Cir. 2010). On appeal, Midwest argues that the manifest weight of the evidence demonstrated that the jury should have found a contract with a 12% annual interest rate and not one with a 24% annual interest rate. In its motion for a new trial before the district court, however, Midwest argued only that the manifest weight of the evidence demonstrated that the parties *never agreed to any contract*. It cannot change course on appeal to raise an argument different than the one it presented to the district court.

III.

Much of Midwest's arguments are based on the flawed assumption that Team Hurricane and MMG are interchangeable. They are not, and Midwest made no effort to pierce the corporate veil. Instead, counsel for Midwest repeatedly suggested at oral argument that her clients were left holding the bag because the go-karts so severely malfunctioned. Of course, this is not a reason to pierce the corporate veil and hold MMG responsible for another company's breach of warranty. Nor is it even an accurate statement. Midwest could have sought recovery for the defective go-karts from Team Hurricane, Cameron Motorsports, or CRG. It did not. The judgment of the district court is AFFIRMED.