In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2006

LATICE PORTER,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cv-07165—**Virginia M. Kendall,** *Judge.*

ARGUED SEPTEMBER 11, 2012—DECIDED NOVEMBER 8, 2012

Before BAUER, POSNER, and WOOD, *Circuit Judges*.

BAUER, *Circuit Judge*. Latice Porter sued the City of Chicago, alleging that the City failed to accommodate her religious practice, discriminated against her on the basis of her religion, and retaliated against her for engaging in protected activity in violation of Title VII, 42 U.S.C. § 2000e *et seq.* The district court granted the City's motion for summary judgment and denied Porter's motion for partial summary judgment, and Porter appealed. For the reasons that follow, we affirm.

## I. BACKGROUND

As this is an appeal from an award of summary judgment to the City, we must construe the facts in the light most favorable to Porter. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Porter has been employed by the City in the Field Services Section ("FSS") of the Records Services Division of the Chicago Police Department since June 10, 1991. The FSS receives and responds to information requests from police personnel and other law enforcement agencies. The FSS staff includes sworn police sergeants, police officers, and civilian employees. Since January 1, 2001, Porter has been a Senior Data Entry Specialist, which is a civilian position. Porter was most recently assigned to the "auto desk," where employees process information in various electronic databases about towed, stolen, repossessed, or recovered vehicles.

The FSS operates twenty-four hours a day, seven days a week. FSS employees are divided into "watches" for purposes of scheduling: the first watch runs from 11:30 p.m. to 7:30 a.m.; the second watch runs from 7:30 a.m. to 3:30 p.m.; and the third watch runs from 3:30 p.m. to 11:30 p.m. Employees are also assigned to groups for their days off; certain employees are assigned to the Friday/Saturday days-off group or the Saturday/Sunday group, and others are assigned to other days-off groups.

During Porter's employment in the FSS, several people were involved in determining or approving FSS employees' work schedules. Joseph Perfetti was the

manager of the FSS from April 2002 until August 2008. As manager, Perfetti supervised several sergeants who served as watch commanders and ran the day-to-day operations of the FSS, including determining employees' schedules. Sergeants Geraldine Sidor, Wanda Torres, and H.A. McCarthy served as watch commanders in the FSS and had the authority to change the days-off schedules of FSS employees at various times between 2004 and 2009. Marikay Hegarty was the Director of Records from late 2004 until late 2006, and, in this capacity, had the authority to determine and approve FSS employees' work schedules. Perfetti assumed the role of Acting Director of the Records from November 2006 until August 2008.

Porter identifies herself as Christian, and she attends church services, bible studies, and prayer services at the Apostolic Church of God. Sunday church services are held at 9:00 a.m., 11:45 a.m., and sometimes 4:00 p.m. Porter has also attended services on Friday nights, Wednesday night bible study, and prayer services on Tuesdays.

Before 2005, Porter worked in a different section of the FSS and had a schedule that required her to work the second watch. She initially had a rotating-weekend days-off schedule, which was changed to an alternating-weekend days-off schedule. This meant that Porter had every other Saturday and Sunday off.

On March 18, 2005, Sergeant Sidor assigned Porter to the Friday/Saturday days-off group beginning March 31, 2005. That same day, Porter sent a memorandum to

Hegarty requesting to be assigned to the Sunday/Monday days-off group. She also informed Sergeant McCarthy that she wanted Sundays off because she was involved in her church and sang in the church choir. Sergeant McCarthy approved Porter's request and reassigned her to the Sunday/Monday days-off group effective March 27, 2005.

In August 2005, Porter sent a letter to her supervisors requesting to work a later shift on Saturdays so she could attend classes as a student minister. Sergeant Torres approved Porter's request, and she was assigned to work from 1:30 p.m. to 8:30 p.m. on Saturdays for the duration of the class, approximately ten weeks. Porter remained on the second watch schedule for the other days of the week.

In October 2005, Porter took leave pursuant to the Family and Medical Leave Act ("FMLA") due to a car accident and pregnancy complications. Following her three months of FMLA leave, Porter took a medical leave of absence for another six months. She returned to the FSS on July 16, 2006.

Upon Porter's return, Sergeant Sidor recommended assigning Porter to the Friday/Saturday days-off group, and Perfetti approved the assignment. Porter remained on the second watch. According to Sergeant Sidor and Perfetti, Porter's assignment was based on "operational needs" to "balance the workforce" because more civilian employees were in the Sunday/Monday days-off group than the Friday/Saturday group at the time of Porter's return. Sergeant Sidor was not aware that

Porter preferred Sundays off in order to attend church services.

After receiving her assignment, Porter met with Perfetti and asked to be reassigned to the Sunday/Monday days-off group because of her church involvement. On July 24, 2006, following the advice of her union president, Porter submitted a Request for Change of Job Assignment Form asking for a change to the Sunday/Monday days-off group. Perfetti told Porter that her request would be accommodated when an opening became available in the Sunday/Monday group. Perfetti also asked a sergeant in the FSS to find out if any other employee assigned to the auto desk would be willing to switch days-off groups with Porter. Sergeant McCarthy asked the auto desk employees if anyone would switch with Porter; no one volunteered.

Porter also communicated with Hegarty regarding her request to change her schedule. Hegarty said she wanted to help Porter and mentioned the option of Porter "going to 3:00 to 11:00" on Sundays. Porter did not follow up with Hegarty about that option.

Porter contends that she was intimidated and harassed by her supervisors at the FSS, both before and after she returned from medical leave. According to Porter, the sergeants and other supervisors in the FSS yelled at her and taunted her, calling her "church girl." She was also threatened with being written up in a complaint register by Sergeant McCarthy for coming to work on a day that she was scheduled to have off. When Porter complained to Perfetti, Perfetti refused to change her days-off

schedule. As a result of these incidents, Porter filed internal grievances.

On August 25, 2006, Porter filed a Chicago Commission on Human Relations ("CCHR") complaint alleging religious discrimination against the City, Sergeant Sidor, and Perfetti.[1] She also filed a charge alleging religion-based discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 14, 2006.

Between the time Porter returned to the FSS on July 16, 2006, and November 12, 2006, Porter was absent from work on some or all of thirty-four days. Sixteen of these days were Sundays. On November 12, 2006, Sergeant Patrick Chambers issued Porter a "counseling session report" regarding her pattern of taking Sundays off. The report contains preprinted text stating that it "is not a disciplinary action," and that its purpose is "to identify concerns or poor performance" and to "advise[] the [employee] that continued action of this kind is unacceptable and may result in either more formalized counseling or intervention." The report also sets forth the reasons Porter provided Sergeant McCarthy for failing to report to work on Sundays: that her "chest hurts after working (5) days" and that she "has a (7) month old baby she has to hold which she holds in a special way." Porter also said that her absences were not intentional.

On November 14, 2006, Porter requested medical leave "due to chronic pain and physical therapy." She took a

---

[1] The CCHR issued an order finding "substantial evidence of discrimination based on religion" on October 2, 2008.

leave of absence on November 16, 2006, and has not returned to the FSS.

Porter filed suit on December 12, 2008, alleging that the City violated Title VII by failing to accommodate her religious practices, discriminating against her based on her religion, and retaliating against her for requesting an accommodation and complaining of religious discrimination. Following discovery, Porter moved for summary judgment as to her failure-to-accommodate claim, and the City moved for summary judgment on all claims.[2] The district court denied Porter's motion and granted summary judgment in favor of the City, concluding that the City had reasonably accommodated Porter's religious practice, and that Porter had failed to put forth sufficient evidence in support of her claims that the City discriminated and retaliated against her.

## II.  DISCUSSION

We review the grant of summary judgment de novo. *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011). In doing so, we construe all the relevant facts and inferences in the non-moving party's favor. *Id.* We will affirm only if "the movant shows that there is no genuine dispute as to any

---

[2]  Porter also moved for a declaratory judgment that the City's policy regarding religious accommodations violates Title VII, which the district court denied. Porter does not appeal this ruling.

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII defines "religion" as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to [sic] an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e-(j). These provisions of Title VII prohibit an employer from intentionally discriminating against an employee based on the employee's religion, and require an employer to make reasonable efforts to accommodate the religious practices of employees unless doing so would cause the employer undue hardship. *See Reed v. Great Lakes Cos.*, 330 F.3d 931, 934-35 (7th Cir. 2003) (citations omitted). Additionally, under Title VII employers may not retaliate against an employee who "opposed any practice" that is unlawful under the statute, or who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the statute]." 42 U.S.C. § 2000e-3(a). On appeal, Porter contends that there are disputed questions of fact regarding whether the City failed to accommodate her religious practice, discriminated against her based on her religion, and retaliated against her for

engaging in activity protected under Title VII. We discuss each of Porter's claims in turn.

## A. Failure to Accommodate

In order to make out a prima facie case of religious discrimination based on an employer's failure to provide reasonable accommodation, a plaintiff "must show that the observance or practice conflicting with an employment requirement is religious in nature, that she called the religious observance or practice to her employer's attention, and that the religious observance or practice was the basis for her discharge or other discriminatory treatment." *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1996) (citations omitted). Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to make a reasonable accommodation of the religious practice or to show that any reasonable accommodation would result in undue hardship. *Id.* at 1575-76. Here, the City does not dispute that Porter has put forth sufficient evidence to defeat summary judgment as to her prima facie case. Our inquiry therefore focuses on whether there is a genuine issue of material fact regarding whether the City satisfied its duty to reasonably accommodate Porter's religious practices or established that doing so would result in undue hardship.

The reasonable accommodation requirement of Title VII is meant "to assure the individual additional opportunity to observe religious practices, but it [does] not impose a duty on the employer to accommodate at all

costs." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977)). This means that a "reasonable accommodation" of an employee's religious practices is "one that 'eliminates the conflict between employment requirements and religious practices.'" *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir. 1993) (quoting *Philbrook*, 479 U.S. at 70, 107 S.Ct. 367). It need not be the employee's preferred accommodation or the accommodation most beneficial to the employee. *Philbrook*, 479 U.S. at 69, 107 S.Ct. 367. Accordingly, "[o]nce the employer has offered an alternative that reasonably accommodates the employee's religious needs . . . 'the statutory inquiry is at an end[.]'" *Ilona*, 108 F.3d at 1576 (citations omitted).

The City contends that it attempted to accommodate Porter's religious practices in several ways. Specifically, the City points to Hegarty's suggestion of a change to a later watch; Perfetti's offer to give Porter the next available opening in the Sunday-Monday days-off group; and Sergeant McCarthy's request for volunteers to switch days-off groups with Porter. We begin and end with Hegarty's suggestion of a watch change as we conclude that the undisputed facts establish that this was a reasonable accommodation.

In her interrogatory answers, deposition testimony, and declaration, Porter stated that she spoke with Hegarty about changing her schedule after returning to work and being assigned to the Friday/Saturday days-

off group.[3] According to Porter, Hegarty, who had the authority to determine and approve the schedules of FSS employees at the time, wanted to help her and suggested that she could switch from her current 7:30 a.m. to 3:30 p.m. watch to the 3:30 p.m. to 11:30 p.m. watch.[4] As Porter sought to attend church services on Sunday mornings, this change in Porter's schedule would have eliminated the conflict between her work schedule and her religious practice, and there is no evidence that this change would have impacted Porter's pay or benefits in any way. Given these undisputed facts, Hegarty's offer of a watch change was a reasonable accommodation. *See Wright*, 2 F.3d at 217; *see also Rodriguez v. City of Chi.*, 156 F.3d 771, 776 (7th Cir. 1998) (listing cases and noting that "it is a reasonable accommodation to permit

---

[3] Porter's amended answers to the City's interrogatories state that she met with Hegarty and had this conversation on July 19, 2006. In her deposition, however, Porter identified the time period in which this conversation occurred as sometime between July and November.

[4] Specifically, Porter testified at her deposition that when she spoke with Hegarty, "[Hegarty] mentioned . . . they could have put me on midnights. Something about me going 3:00 to 11:00. Her saying something about maybe helping me to do something about going to 3:00 to 11:00." Porter's interrogatory answers state that she spoke with Hegarty on July 19, 2006, and that "Ms. Hegarty said something about trying to help me. She also said something about me working '3:30 - 11:30[.]' " Porter's declaration also states that she "had a conversation with Marikay Hegarty where she mentioned the possibility of helping me switch watches to 3:30 to 11:30."

an employee to exercise the right to seek job transfers or shift changes, particularly when such changes do not reduce pay or cause loss of benefits"). In fact, Porter had previously received a similar accommodation in August 2005 in order to attend ministry classes on Saturday mornings.

Porter's deposition testimony makes clear that she did not want to work the later watch and instead preferred to be returned to the Sunday/Monday days-off group she was in prior to taking medical leave. Nevertheless, "it is well settled that 'Title VII . . . requires only reasonable accommodation, not satisfaction of an employee's every desire.'" *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 475 (7th Cir. 2001) (quoting *Rodriguez*, 156 F.3d at 776). Had changing watch groups affected Porter's pay or other benefits, a much more rigorous inquiry would be required. That is not the case before us, however. Porter simply did not want to work the later watch, but that does not make the proposed accommodation unreasonable. *See Wright*, 2 F.3d at 217 (noting that accommodation offered was reasonable even though it required the plaintiff "to take a job that most people did not want").

Porter does not dispute that changing to a later watch would have eliminated the conflict with the Sunday morning church services she wanted to attend. Instead, she maintains that Hegarty's suggestion was insufficient to meet the City's burden because Hegarty "merely mentioned the possibility of shifting Porter's hours" and Porter "denies she was invited to apply or even

informed how to make such a request." We reject these arguments.

In requiring employers to "offer reasonable accommodations," we have encouraged "bilateral cooperation" between the employee and employer and recognized that employers must engage in a dialogue with an employee seeking an accommodation. *See Rodriguez*, 156 F.3d at 777-78 (citing *Philbrook*, 479 U.S. at 69, 107 S.Ct. 367). We have not demanded the hand-holding Porter argues was lacking here, however, for an offer of an accommodation to be sufficient under Title VII. In *Rodriguez*, for example, Officer Rodriguez sent a memorandum to his commander seeking to be exempted from future assignments at abortion clinics because of his religious beliefs; his commander never responded to that request. *Id.* at 773-74. Although this failure concerned us, we held that the City nonetheless satisfied its duty "to open a dialogue with Officer Rodriguez on the question of reasonable accommodation" by engaging in the collective bargaining process with Officer Rodriguez's union, which resulted in a collective bargaining agreement that provided Officer Rodriguez with the option to transfer districts and avoid assignments at abortion clinics. *Id.* at 778. Because Officer Rodriguez was aware of this provision in the collective bargaining agreement, we held that his commanding officer's failure to respond to his request did not prejudice him and was not a violation of Title VII. *Id.*

Here, the undisputed facts give us even less pause than the facts in *Rodriguez*. When Porter went to Hegarty to discuss her schedule, Hegarty proposed the watch

change as a possible remedy. Porter, however, expressed no interest in that option and did not pursue it further.[5] We cannot find fault with the City for failing to take further steps to change Porter's watch given these undisputed facts. Additionally, Porter's complaints regarding the City's failure to inform her as to how to execute a schedule change ring hollow in light of the fact that these requests can be made on the same form that Porter used to request a change of days-off groups, and Porter had successfully changed the hours she worked on Saturdays in August 2005 by requesting the change in a letter to her supervisors. We conclude, as the district court did, that the City discharged its obligation under Title VII by offering Porter an accommodation that would have eliminated the conflict between her work schedule and her religious practice of attending church services on Sunday morning.

---

[5] During Porter's deposition, after she testified that Hegarty mentioned the option of working from 3:00 to 11:00, the following exchange occurred:

Q: Did you tell Marikay [Hegarty] that you would work 3:00 to 11:00?

A: No, I did not tell her that.

Q: Did you tell her you wouldn't?

A: No, I did not tell her I would or would not. I think it was a thought that maybe I should consider that. I have a baby, No. 1. No. 2, that wasn't my battle right there to try to switch myself to nothing.

**B. Disparate Treatment**

Porter also alleged a disparate treatment claim under Title VII, claiming that she was subjected to adverse employment actions because of her religion. As discussed above, in addition to requiring employers to reasonably accommodate the religious practices of its employees, Title VII also prohibits employers from discriminating against an employee on the basis of the employee's religion. 42 U.S.C. § 2000e-2(a)(1). To defeat an employer's motion for summary judgment on a claim of intentional discrimination under Title VII, a plaintiff can proceed under either the "direct" or "indirect" method of proof. Under the direct method, the method under which Porter proceeds, a plaintiff must marshal sufficient evidence, either direct or circumstantial, that an adverse employment action was motivated by discriminatory animus. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). We have indicated some flexibility in how to approach cases presenting complaints of religious discrimination, but we have consistently required that the employee have been subjected to an adverse employment action in order to maintain a disparate treatment claim. *E.g.*, *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1169-70 (7th Cir. 1998) (citing with approval the approach for a religious discrimination claim set forth in *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1038 (10th Cir. 1993), requiring that the plaintiff show "(1) that he was subjected to some adverse employment action; (2) that . . . the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken

because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs"); *Venters v. City of Delphi*, 123 F.3d 956, 972-73 (7th Cir. 1997). We, like the district court, conclude that Porter failed to put forth sufficient evidence to create a triable issue of fact as to the adverse employment action element.

Although we have defined adverse employment actions "quite broadly," *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 612 (7th Cir. 2001), an adverse action must materially alter the terms or conditions of employment to be actionable under the antidiscrimination provision of Title VII. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (explaining that the terms of the antidiscrimination provision of Title VII "explicitly limit the scope of that provision to actions that affect employment or alter the conditions of the workplace"). This means that the action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). For example, a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady*, 993 F.2d at 136 (citations omitted). We have cautioned, however, that "not everything that makes an employee unhappy is an actionable

adverse action. Otherwise, minor and even trivial employment actions that 'an . . . employee did not like would form the basis of a discrimination suit.'" *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (citation omitted).

On appeal, Porter contends that her placement in the Friday/Saturday days-off group upon her return from medical leave in July 2006 and the issuance of the counseling session report in November 2006 were adverse employment actions. Porter fails, however, to put forth evidence that either of these actions materially altered the terms or conditions of her employment. Absent such evidence, these actions are indistinguishable from the schedule changes and reprimands without material consequences that we have held generally do not constitute adverse employment actions. *See Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ("[W]ritten reprimands without any changes in the terms or conditions of . . . employment are not adverse employment actions.") (citations omitted); *Oest,* 240 F.3d at 613 (finding that written reprimands received under progressive discipline policy were not adverse employment actions); *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001) (rejecting the plaintiff's constructive discharge claim and observing that "[the employer's] decision to change [the plaintiff's] working hours certainly does not rise to the level of an adverse employment action" because the plaintiff's "pay and job title remained the same, and she suffered no significantly diminished job responsibilities").

Nonetheless, as Porter points out, these are not hard and fast rules. We held in *Washington v. Ill. Dep't of Revenue*,

420 F.3d 658, 662 (7th Cir. 2005), that given the plain-tiff's unique circumstances, a reasonable jury could conclude that the alteration of her work schedule con-stituted an adverse employment action for purposes of her retaliation claim. Specifically, we noted the evidence suggesting that in altering the plaintiff's schedule, the employer sought to exploit a known vulnerability of the plaintiff—her reliance on her previously established flex-time schedule so she could care for her son, who had Down's syndrome. *Id.* Additionally, the evidence indicated that the schedule change "caused a significant (and hence an actionable) loss" to the plaintiff because she was forced to use leave for two hours per day, causing her vacation and sick leave to drain away. *Id.* at 662-63.

*Washington* is clearly distinguishable from the case before us, however. Porter has failed to point to any evidence in the record suggesting that her assignment to the Friday/Saturday days-off group in July 2006 after her nine-month leave was meant to exploit "a known vulnerability," namely, her practice of attending church on Sunday mornings. Instead, in testimony that remains uncontradicted, Sergeant Sidor and Perfetti stated that Porter was placed in that group to balance the days-off groups, and as discussed above, Hegarty tried to resolve the conflict between Porter's work and church schedules. Furthermore, although Porter claims she suffered an economic loss when she had to use her vaca-tion and sick days, and ultimately unpaid time, to take Sundays off, the undisputed evidence—including Porter's own statement in the counseling session re-

port—indicates that she took those days off for medical reasons, not to attend church. Although Porter now argues that a jury could infer the contrary, she cites no evidence in support of that inference.

Porter also contends that her disparate treatment claim is actionable because she was subjected to a hostile work environment. This theory fares no better. To prevail on a hostile work environment claim, Porter must demonstrate that: "(1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her [religion]; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) (citing *Dear v. Shinseki*, 578 F.3d 605, 611 (7th Cir. 2009)). In determining whether the evidence in support of a hostile work environment claim meets this standard, we consider the totality of the circumstances, *Venters*, 123 F.3d at 975, including "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Scruggs*, 587 F.3d at 840 (citation omitted).

Here, the only specific instances of harassment Porter has alleged are being called "church girl," being told to sit down "in a high-pitched voice" by her supervisor, being threatened with a "CR complaint" when she showed up to work on one of her days off, and receiving the counseling session report in November 2006.

Even assuming that Porter can show that this conduct was based on her religion, we agree with the district court that it was not severe or pervasive enough to fall within Title VII's purview. Porter's vague and conclusory allegations of being "harassed" and "intimidated" by her supervisors do not change our conclusion; without more detail, a reasonable jury could not find that the conduct was objectively offensive, severe, or pervasive. *See Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010) ("We often call summary judgment the 'put up or shut up' moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely." (internal citations omitted)); *Payne v. Pauley,* 337 F.3d 767, 772-73 (7th Cir. 2003) ("[T]he Federal Rules of Civil Procedure require the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.' Conclusory allegations, unsupported by specific facts, will not suffice." (quoting Fed. R. Civ. P. 56(e))). Viewing the record before us in the light most favorable to Porter, the most we can say is that she was subject to sporadic inappropriate and rude comments by her supervisors, but "[o]ffhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Scruggs,* 587 F.3d at 840-41 (citation omitted). Because Porter failed to put forth evidence from which a reasonable jury could conclude that her work environment was objectively offensive

and that the conduct complained of was severe or pervasive, summary judgment was appropriate on this claim.


### C. Retaliation

Porter's final claim is that the City retaliated against her for engaging in protected activity under Title VII. In addition to prohibiting discrimination, Title VII "forbids retaliation against anyone who 'has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 314 (7th Cir. 2011) (quoting 42 U.S.C. § 2000e-3(a)). The purpose of this antiretaliation provision is to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. and Santa Fe Ry. Co.*, 548 U.S. at 68, 126 S.Ct. 2405 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). Because of this purpose and the textual distinction between the antiretaliation provision and the antidiscrimination provision, the Supreme Court has held that "Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct . . . and [it] is not limited to discriminatory actions that affect the terms and conditions of employment." *Thompson v. N. Am. Stainless, LP*, ___ U.S. ___, 131 S.Ct. 863, 868, 178

L.Ed.2d 694 (2011) (internal quotation marks and citations omitted). Under this broad construction of the antiretaliation provision, the pertinent inquiry is whether an employer has acted in a way that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (citation omitted).

As with discrimination claims, a plaintiff may establish retaliation under the direct or indirect method of proof. *See Weber v. Univs. Research Ass'n, Inc.,* 621 F.3d 589, 592 (7th Cir. 2010). On appeal, Porter has not pointed to evidence of any similarly-situated employees not subjected to the same adverse action she alleges, so we assume she is proceeding only under the direct method of proof. *See Silverman v. Bd. of Educ. of City of Chi.,* 637 F.3d 729, 741 (7th Cir. 2011). "To avoid summary judgment on a retaliation claim under the direct method, [the plaintiff] must produce evidence from which a jury could conclude: (1) that she engaged in a statutorily protected activity; (2) that she suffered a materially adverse action by her employer; and (3) there was a causal link between the two." *Benuzzi v. Bd. of Educ. of City of Chi.,* 647 F.3d 652, 664 (7th Cir. 2011) (internal quotation marks and citation omitted).

We assume, as the parties do, that Porter engaged in statutorily protected activity, including her request to have Sundays off in March 2005, her request for a schedule adjustment to attend ministry classes in August 2005, her requests for a days-off change following her return to work in July 2006, and her CCHR and EEOC charges in August and September 2006. Our

inquiry accordingly focuses on the second and third elements of Porter's claim. As to the second element, the only potentially retaliatory action Porter points to in her brief is her assignment to the Friday/Saturday days-off group upon her return from leave in July 2006. Even though the category of "materially adverse actions" under Title VII's antiretaliation provision "sweeps more broadly than the 'adverse employment actions' required to sustain a discrimination claim," *id.* at 665 (citation omitted), we doubt that Porter's assignment to the Friday/Saturday days-off group was a materially adverse action for purposes of her retaliation claim. In *Burlington Northern*, the Supreme Court made clear that context matters to the determination of what constitutes a materially adverse action. 548 U.S. at 69, 126 S.Ct. 2405. Here, Porter's assignment to the Friday/Saturday days-off group came after her nine-month leave and with a subsequent offer to accommodate her Sunday morning church attendance—albeit not the exact accommodation she sought—and the promise that she would receive the next opening in the Sunday/Monday days-off group. In this context, we do not think the treatment Porter received would dissuade a reasonable worker from seeking an accommodation.

Even assuming, however, that Porter's assignment to the Friday/Saturday days-off group in July 2006 constituted a materially adverse action, Porter failed to adduce any evidence from which a reasonable jury could find a causal connection between that assignment and her requests for accommodations in March and August 2005. Instead, the evidence indicates that she

received the accommodations she sought in March and August 2005, and nearly a year passed between those requests and her July 2006 assignment to the Friday/Saturday days-off group. Given this time lapse, the fact that the assignment to the Friday/Saturday group came after her successful requests for accommodations does not suffice to show a causal connection. *See, e.g., Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (finding that periods of five weeks and two months between alleged retaliatory actions and protected activities "militate against" inference of causation based solely on suspicious timing); *Healy v. City of Chi.*, 450 F.3d 732, 741 n.11 (7th Cir. 2006) (finding no suspicious timing when events were separated by more than one year); *Wallscetti v. Fox*, 258 F.3d 662, 669 (7th Cir. 2001) ("[T]he length of time between the protected speech and the adverse employment action is at least four months, which, without more, is too long to support a reasonable inference of causation."). Additionally, the evidence indicates that Sergeant Sidor, who made the recommendation to put Porter in the Friday/Saturday days-off group upon her return from leave, did so to balance days-off groups and did not know that Porter wanted Sundays off to attend church. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) ("A claim of retaliation based on suspicious timing depends on what the relevant decision-makers knew and when[.]"). Accordingly, the district court appropriately granted summary judgment on Porter's retaliation claim.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.